**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ajibola J. EDUN, Defendant–Appellant.**

No. 88–3209.

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1989.

Decided Dec. 8, 1989.

Kristina M.L. Anderson (argued), and Thomas M. Durkin, Asst. U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Craig J. Katz (argued), Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, CUMMINGS and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

In a bench trial, the district court found the defendant, Ajibola Edun, guilty of the

following offenses: (1) conspiring to import heroin, in violation of 21 U.S.C. §§ 952(a), 963, and 18 U.S.C. § 2; (2) conspiring to possess heroin with intent to distribute, in violation of 21 U.S.C. § 846; (3) using a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c); and (4) using a communication facility in committing these offenses, in violation of 21 U.S.C. § 843(b). In this appeal, Mr. Edun submits that the government failed to offer sufficient evidence in support of the section 924(c) violation and that the district court erred in crediting the testimony of the government's primary witness. We affirm the defendant's conviction.

## I

## FACTS

### A. *The Government's Case*

The government's primary witness against Mr. Edun was Tessy Akinwande, a Nigerian citizen who had pleaded guilty to transporting heroin into the United States and was a cooperating witness in this case. The defendant did not request that the district court make any special findings. *See* Fed.R.Crim.P. 23(c). We reconstruct the facts of the case from Akinwande's testimony.

For at least four years before his arrest, Akinwande had worked as an accountant at Galaxy Airways in Lagos, Nigeria, where he met a man named Gabriel Nasal. In January 1988, Nasal introduced Akinwande to Rasaq Balogun. At that first meeting, the three men discussed traveling. Balogun proposed "doing something" for Akinwande and indicated that Akinwande would earn $1,500—the equivalent of three years' salary at Galaxy Airways—if he delivered heroin to Balogun's friend in the United States. Akinwande was interested and agreed to undertake the delivery. He gave his passport to Balogun who promised to obtain a visa for Akinwande. Under their plan, Akinwande would make an initial trip in March; he would not carry any drugs. The purpose of this trip would be to familiarize him with the travel route and to

allow him to meet Balogun's friend, Mr. Edun (called George). If all went smoothly, Akinwande would return to the United States in May; this time he would carry heroin.

Balogun met with Akinwande in February and again discussed the approaching trip to the United States. Balogun reiterated that Akinwande would contact and stay with Mr. Edun, who lived in Chicago. On March 1, Balogun visited Akinwande a final time to deliver the promised visa and plane ticket. Balogun also provided Akinwande with Mr. Edun's phone number and instructed Akinwande to call Mr. Edun upon arrival in New York. As directed, Akinwande telephoned Mr. Edun from the New York airport. Mr. Edun informed Akinwande that a ticket was waiting for him at the Midway Airlines ticket counter. Akinwande picked up the ticket and flew to Chicago. He then hired a taxi and was driven to Mr. Edun's home in Calumet City.

Akinwande stayed at Mr. Edun's home for three weeks. The defendant had been in contact with Balogun before Akinwande's arrival and knew the details of Akinwande's future "mission" in May. The pair discussed heroin and the particulars of the May visit. Before Akinwande left, Mr. Edun agreed to make arrangements for Akinwande's subsequent trip to Chicago. Akinwande then returned to Lagos. There he discussed his Chicago experiences with Balogun. Balogun told Akinwande that he would carry heroin on his next trip to the United States.

Approximately two weeks after Akinwande's return to Nigeria, Nasal and Balogun met with him and explained some details of the return trip to the United States in May. To demonstrate how Akinwande would transport the heroin, Nasal swallowed two "balloons"—actually condoms—filled with heroin. The day Akinwande left for the United States, Balogun brought Akinwande ninety-two "balloons" filled with heroin. Akinwande swallowed them all. Balogun then instructed Akinwande to call Mr. Edun upon arrival in New York as he had done on the first trip. Balogun also

mentioned that Mr. Edun would pay Akinwande $1,500.

When he arrived in New York, Akinwande was detained by Customs agents. An X-ray examination administered with his consent revealed his fragile contraband cargo. Akinwande then was taken to a hospital where the balloons were removed safely. He was placed under arrest and subsequently agreed to cooperate with law enforcement authorities. Accordingly, Akinwande made a telephone call to the defendant's number, but Mr. Edun was not home. Akinwande attempted to reach Mr. Edun several more times and spoke with the defendant's wife on each call. In their first conversation, she informed Akinwande that Balogun had called. Akinwande left a telephone number where he could be reached in New York and asked that Mr. Edun call back. When the defendant returned Akinwande's calls, Akinwande reported that he had "got two out." Tr. at 72. Mr. Edun responded that he understood and then directed Akinwande to "[c]ome on with the heroin and help [me] sell it." Tr. at 40. A translated transcript of these phone calls was admitted into evidence.

Akinwande then flew from New York to Midway Airport in Chicago. Upon his arrival, he made further recorded telephone calls to Mr. Edun. The defendant eventually met Akinwande at Midway Airport. Akinwande was carrying a bag containing drugs, and he began to discuss the heroin. Mr. Edun quieted him and admonished that they should not discuss that subject in the airport but should get to the car. Akinwande testified that he handed the bag to Mr. Edun as the pair left the airport. When they reached Mr. Edun's car, parked fifteen feet from the building, government agents stopped and arrested them. A search of the car revealed a .38 caliber semi-automatic handgun and ammunition in the trunk. No fingerprints were found on the gun. Title to the car, which had been purchased five days earlier, was held jointly by the defendant and his wife.

At trial, the government also called Drug Enforcement Administration Agent Robert Fanter who testified to the quantity and quality of the heroin seized. Agent Fanter stated that the government seized 122.3 grams of 66% pure heroin, having a street value of more than $98,000; 150.7 grams of 71% pure heroin, having a street value of $120,000; and 37.5 grams of 86% pure heroin, having a street value of more than $30,000. Agent Fanter testified that the total amount of heroin, just over 300 grams, would support a heroin addict's daily use for over two years.

B. *The Defense Case*

Mr. Edun moved for a judgment of acquittal at the close of the government's case. The motion was based solely upon Mr. Edun's position that Akinwande's testimony lacked credibility. Having determined that there was relevant evidence from which it could find the defendant guilty of each count beyond a reasonable doubt, the trial court denied the motion.

Mr. Edun called one witness. Special DEA Agent Mark Giuffre testified that he saw Akinwande and the defendant leave the airport; Akinwande was carrying the bag containing heroin. Agent Giuffre was unable to say with certainty who was carrying the drugs at the time of arrest, but agreed that it was "clear that nobody ever saw Mr. Edun carrying the bag." Tr. at 100.

## II

## ANALYSIS

A. *The Firearms Charge—Sufficiency of the Evidence*

1.

Mr. Edun's first contention is that the government failed to present sufficient evidence to sustain a conviction under 18 U.S.C. § 924(c). That statute provided in relevant part:

(1) Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime,, [sic] be sentenced to imprisonment for five years....

(2) For purposes of this subsection, the term "drug trafficking crime" means any felony violation of Federal law involving the distribution, manufacture, or importation of any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)).

18 U.S.C. § 924(c).[1]

■ At the outset, we note that Mr. Edun bears a heavy burden. In reviewing a sufficiency challenge, "[t]he test is whether, after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir. 1984) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

We recently had occasion to explore the meaning of section 924(c) in *United States v. Rosado*, 866 F.2d 967 (7th Cir.), cert. denied, —— U.S. ——, 110 S.Ct. 117, 107 L.Ed.2d 79 (1989). We noted that "the starting point for our analysis of section 924(c) is the plain language employed by Congress." *Id.* at 969 (citing *Indiana Port Comm'n v. Bethlehem Steel Corp.*, 835 F.2d 1207, 1210 (7th Cir.1987)); *see also United States v. Nash*, 876 F.2d 1359, 1362 (7th Cir.1989) (to construe the meaning of § 924(c)(2) the court began with the statute's plain language); *United States v. Rawlings*, 821 F.2d 1543, 1545 (11th Cir.) ("When examining [section 924(c) ], we must assume that Congress used the words of the statute as they are commonly and ordinarily understood."), cert. denied, 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987). Read in this manner, section 924(c) contains two essential elements. First, the defendant must have *used* or *carried* the firearm, and second, this use or carrying of the firearm must have been *during and in relation to* a crime of violence or drug trafficking offense. The government must prove each component of section 924(c) beyond a reasonable doubt before the defendant may be found in violation of the statute and thus subject to the mandatory five-year prison sentence.

2.

Before proceeding further with our analysis, it is necessary to pause and examine in some detail how this issue was presented in the district court and how the parties present it to us on this appeal.

As we noted earlier, unlike the vast majority of federal criminal trials, the proceeding in the district court was a bench trial. During that bench trial, little attention was given to the offense of carrying or using a weapon during the commission of a drug offense. At the end of the government's opening statement, there was a brief mention of the weapon:

An inventory search of the BMW later found a fully loaded semi-auto revolver in the trunk of the car. And that is the basis for the charge that he was carrying a firearm during and in relation to the drug crimes.

Tr. at 8. At the close of the government's case, the Assistant United States Attorney read into the record a stipulation regarding the discovery of the weapon:

Government Exhibit No. 2 is a firearm; namely, an Armi F. LL I tang Foglio–Gardone VT model GT .380 caliber semi-automatic weapon, serial number 64341 and ammunition.

Government Exhibit 2 was found in the trunk of the BMW VIN number, which

---

**1.** This was the version of section 924(c) in effect when Mr. Edun committed the crime. The statute has since been amended and now reads in relevant part:

(1) Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....

(2) For purposes of this subsection, the term "drug trafficking crime" means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or the Maritime Drug Law Enforcement Act (46 U.S.C.App.1901 et seq.).

18 U.S.C. § 924(c).

was just read, driven by defendant Ajibola G. Edun at the time of his arrest. The Chicago Police Department laboratory was unable to find any fingerprints on the firearm, Government Exhibit 2.

Tr. at 90. The record contains no suggestion why the government, throughout trial, relied exclusively on whether the defendant *carried* the weapon and did not argue the broader proposition that he *used* the weapon. During closing arguments, defense counsel argued briefly that his client had no knowledge that the gun was in the trunk of the car. Although no mention had been made of the firearms charge in the government's earlier closing argument, the Assistant United States Attorney did address the matter briefly in rebuttal:

> Your Honor, I ask you also to use your common sense. A .38 semi-automatic fully loaded gun in the trunk of the car is there for a purpose. The purpose is the fact that the defendant is a drug dealer. He's about to pick up a large load of heroin from Tessy Akinwande.

Tr. at 107. No mention of this firearms charge was made in the defendant's motion for judgment of acquittal. Nor was there any specific reference to the firearms charge when the court rendered a verdict.

On appeal, we also are confronted with an unusual situation. Relying on *United States v. Nelson*, 733 F.2d 364, 370–71 (5th Cir.), *cert. denied,* 469 U.S. 937, 105 S.Ct. 341, 83 L.Ed.2d 276 (1984), and *United States v. Barber*, 594 F.2d 1242, 1244 (9th Cir.), *cert. denied,* 444 U.S. 835, 100 S.Ct. 69, 62 L.Ed.2d 46 (1979), Mr. Edun submits that the government failed to prove the firearms offense because there was no proof that he *knew* the weapon was in the trunk. Notably, he does not argue in his brief that the government's case with respect to this offense is deficient in any other way. Specifically, he does *not* argue that, assuming he had knowledge of the weapon's presence, its location in the locked trunk of the car could not constitute either "carrying" or "using" the weapon during the commission of the drug offense.[2] By contrast, the government fails to address the appellant's contention that he did not know of the weapon's presence; instead, it focuses on the location of the weapon and submits that Mr. Edun *carried* the weapon despite its presence in the trunk of his car.[3]

### 3.

■ We must, of course, deal with the issue tendered by Mr. Edun in his appellate brief and at oral argument. As he points out, there is authority for the proposition that "the government does have to prove that the defendant knowingly carried a firearm in order to sustain a conviction under section 924(c)(2)." *Nelson,* 733 F.2d at 370; *accord Barber,* 594 F.2d at 1244. However, as the Chief Judge pointed out at oral argument, "this rudimentary mental element," *Barber,* 594 F.2d at 1244, can be established not only by direct but also by circumstantial evidence. Indeed, *Barber* makes that specific point abundantly clear. *Id.* The evidence of record permitted the trier of fact, here the district court, to conclude that Mr. Edun had driven a newly

---

**2.** At oral argument, this matter was pursued vigorously by the court:

The Court: Suppose he knew the gun was in the trunk?

Counsel: Well then there is another situation entirely. But there was no evidence presented to that.

The Court: I understand that. Suppose he knew it was in the trunk?

Counsel: If he knew it was in the trunk then I believe that the government would have had a better standing than they do now.

The Court: Why?

Counsel: Because his knowledge, based on case law, that the gun was there would have put in his mind the possibility that the gun was there for the transaction of the narcotics or to give him some support or threat or intimidation.

The Court: Are you sure you want to admit that?

Counsel: If he knew that the gun was in the trunk.

The Court: Are you sure you want to admit that? The statute says use or carry.

Counsel: Our main point of contention is the knowledge.

The Court: Ok.

**3.** While the government argues, as it did at trial, that Mr. Edun *carried* the weapon, it relies as well, without explanation, on cases that deal with *use* of the weapon.

purchased BMW automobile, registered in the names of Mr. Edun and his wife, to Midway Airport. The trip was for the purpose of picking up a "mule" who, acting according to a plan devised with Mr. Edun's participation, was importing into our country a quarter of a million dollars worth of heroin. Throughout this venture, the car was under the exclusive control of Mr. Edun. From this evidence, it was reasonable for the district court to conclude that Mr. Edun knew of the presence of the weapon. *See United States v. Anderson,* 881 F.2d 1128, 1141 (D.C.Cir.1989) (jury properly could conclude that defendant knowingly possessed a weapon found in his apartment); *United States v. Talkington,* 875 F.2d 591, 595 n. 2 (7th Cir.1989) (knowledge that defendant possessed counterfeit money may be inferred from the surrounding circumstances).

### 4.

As we have noted already, the government also addresses whether, despite the location of the weapon in the trunk of the car, Mr. Edun can be convicted of having carried the weapon during the commission of the drug offense. The government is replying to an argument that was never made. Indeed, it invites us to define "carries" broadly and suggests that we should reject the more restrictive approach of some, but not all, of the circuits that have met the issue. We must decline this invitation to address definitively the outer limits of the statutory language. Even assuming that the constitutional constraint that forbids our rendering advisory opinions might allow us to address the issue, *see* U.S. Const. art. III, § 2, prudential considerations certainly counsel against such a course. Defining the scope of the statutory term "carries" (upon which the government places sole reliance) has not been an easy task for our colleagues in other circuits. *Cf. Anderson,* 881 F.2d at 1140–41 (instruction that defendant could be found to "carry" the weapon if it were

"convenient of access or within reach" was not plainly erroneous); *United States v. Cardenas,* 864 F.2d 1528, 1536 (10th Cir.) (mere transportation of a firearm insufficient although "dominion and control" may extend beyond defendant's person in the context of a motor vehicle), *cert. denied,* — U.S. ——, 109 S.Ct. 3197, 105 L.Ed.2d 705 (1989); *United States v. Feliz–Cordero,* 859 F.2d 250, 253 (2d Cir.1988) (weapon must be within reach of defendant); *United States v. Stewart,* 779 F.2d 538, 540 (9th Cir.1985) (weapon in trunk might serve as basis for conviction if, under proper instructions, the jury finds that the firearm is within possession or control of person who commits offense and weapon facilitated or had a role in crime such as emboldening an actor), *cert. denied,* 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987). Our court has dealt with the concept in a far more conventional context. *See United States v. Ocampo,* 890 F.2d 1363, 1371 (7th Cir.1989).[4] Courts must decide difficult issues such as this one on the basis of the record before them; this record is, to put it mildly, meager. Since resolution of the matter is not necessary to our decision today, we shall await a more plenary record and a case where we have the benefit of the adversary process "which sharpens the presentation of issues." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

### B. *Credibility of Akinwande*

Mr. Edun's second submission is that his convictions on all counts should be reversed because the district court erroneously credited the testimony of Akinwande. According to the defendant, Akinwande's recounting of the facts is " 'so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it.' " Appellant's Br. at 21 (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)). We cannot agree. "An appellate court will not weigh the evidence or assess

---

**4.** Of course, we also have dealt with this concept in a factual situation where the defendant both carried *and* used the weapon. *See United States*

*v. Rosado,* 866 F.2d 967 (7th Cir.), *cert. denied,* — U.S.——, 110 S.Ct. 117, 107 L.Ed.2d 79 (1989).

the credibility of the witnesses." *United States v. Ramirez,* 796 F.2d 212, 214 (7th Cir.1986). " 'It is well settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather, that question is left to the sound discretion of the trier of fact.' " *United States v. Perry,* 747 F.2d 1165, 1170 (7th Cir.1984) (quoting *United States v. Roman,* 728 F.2d 846, 856 (7th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984)); *see also United States v. Vega,* 860 F.2d 779, 794 (7th Cir.1988); *United States v. Noble,* 754 F.2d 1324, 1332 (7th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). *But see United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir. 1989) ("To be incredible as a matter of law, a witness' testimony must be unbelievable on its face. In other words, it must have been either physically impossible for the witness to observe that which he or she claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all."); *United States v. Kuzniar,* 881 F.2d 466, 770–71 (7th Cir. 1989) (same principle).

## CONCLUSION

We affirm the district court's judgment of conviction. The record supports a determination that Mr. Edun knew of the presence of the gun in the vehicle. Additionally, the district court was entitled to credit the testimony of Akinwande as evidence establishing Mr. Edun's other crimes.

AFFIRMED.